50

wtk

1   witness.

2            HEARING OFFICER WOODS:  So, what we're

3   going to do, Ms. Gales, is we're going to move into

4   now proving the allegations that we've just

5   clarified that are at issue.  As you probably

6   understood, DCPS was going to call another

7   witness--I'm not sure who that was, I'll just state

8   that we didn't get them.  But that witness is

9   unavailable by phone.  You were listed as one of

10  the witnesses for District of Columbia Public

11  Schools.  I don't know if you were aware of that,

12  but they actually listed you as one of their

13  witnesses.

14           So what that means is, they're allowed to

15  question you, as well, as one of their witnesses.

16  And so, Ms. Chapman is calling you as that witness

17  right now.

18           What I'd like to do is, then, swear you in

19  as a witness.  Ms. Chapman will call you as a

20  witness and once her questions are done, Ms.

21  Barrie, then, will be allowed to ask you questions.

22  And I'm going to allow Ms. Barrie to go beyond the

51

wtk

1  scope of your direct because Ms. Barrie was going

2  to call her as a witness, also.

3          MS. CHAPMAN:  Okay.

4          HEARING OFFICER WOODS:  That way, we could

5  just--

6          MS. CHAPMAN:  Well, after I finished with

7  the Parent, I was going to try to call the other

8  witness and then I was going to argue from the

9  Record.

10         HEARING OFFICER WOODS:  Oh, I see.  But,

11 still could Ms. Barrie go beyond the scope so we

12 don't have to call the mother--it's up to you, I

13 don't see why we have to have her testify twice.

14 But if--

15         MS. CHAPMAN:  Okay, I mean, if she could

16 just--the only thing I would ask is that she limit

17 her cross to what was in my thing and then go--she

18 can go right into it.

19         HEARING OFFICER WOODS:  It's going to be

20 difficult, yeah.  So, what would you offer for--

21         MS. BARRIE:  I would prefer to just do a

22 one-time thing.

52

wtk

1    MS. CHAPMAN:  Like I said, I don't have a

2    problem with her staying on the stand, but what I

3    do have a problem with is her--as long, I'll just

4    put it this way--the Hearing Officer will take note

5    of the testimony in terms of--

6        MS. BARRIE:  Okay, I can do my cross--and

7    then, stop and--

8        MS. CHAPMAN:  Right, that's what I meant.

9        HEARING OFFICER WOODS:  Okay, that's fine.

10       MS. CHAPMAN:  Thank you.

11       HEARING OFFICER WOODS:  That probably

12   won't make a lot of sense to you, but legally,

13   well, what you won't have to be is called twice,

14   when Ms. Barrie start asking you questions, she can

15   ask you questions with regard to what Ms. Chapman

16   said and then she can ask you questions about other

17   matters that Ms. Chapman didn't even raise.

18       Whereupon,

19            MS. NORMA GALES

20   was called as a witness and, having been first duly

21   sworn by the Hearing Officer was examined and

22   testified as follows:

299

53

wtk

1              HEARING OFFICER WOODS:   You may proceed.

2    I'm sorry, Ms. Chapman, you may proceed.

3                    DIRECT EXAMINATION

4         BY MS. CHAPMAN:

5         Q    Good morning, Ms. Gales, my name is

6    Rashida Chapman, I'm the Attorney Adviser for DCPS,

7    how are you?

8         A    I'm fine.

9         Q    Good, can you just state your full name

10   for the record, please

11        A    Norma [unintell.] Gales.

12        Q    Are you familiar with a T███ T█████?

13        A    T█████ T████.

14        Q    T█████ T████, sorry.

15        A    Yes, I am.

16        Q    How are you familiar with her?

17        A    She's my daughter.

18        Q    Now, can you tell me if you've had an

19   opportunity to attend a MDT/IEP meeting for your

20   daughter during the month of August?

21        A    Yes.

22        Q    Can you tell me when that meeting was?

54

wtk

1    A    August 2, around 10:30 a.m.

2    Q    Can you tell me if--did the issue of a

3  psychiatric come up during that meeting?

4    A    No.

5    Q    No?  Okay.  Can you tell me, then, what

6  your position is on your daughter taking

7  medication?

8    A    I refused the medication.

9    Q    And why did you refuse the medication?

10    A    I refused it based on [unintell.] and to

11  my knowledge of my knowing my child, she's been

12  sick and [unintell.] no--I refused it because most

13  kids look like zombies.

14    Q    You are aware that the--so, tell me, then,

15  if you refused the medication, why are you

16  requesting a psychiatric evaluation?

17    A    No, that was brought to my attention by

18  Dr. Jones at Payne [ph] about the medication.  And

19  I refused what came up about the medication was

20  that I would ask to have added LD to her

21  disability.  And Dr. Jones suggested the medicine

22  and some other means of her dealing with her ADHD.

55

wtk

1    Q    Why did you ask that they add LD to her

2    classification?

3    A    Because my daughter, now, she was two

4    grade levels behind in reading.  And special-ed

5    don't have a grade, but she's classified as third

6    grade.  And she was reading on first-grade level.

7    Now, if she's going on, she'll be three grade

8    levels down.  My daughter is not performing on her

9    supposed grade level reading level and that's why I

10   asked them to change her--put--add LD because she

11   has some real learning disability as far as

12   reading.

13   Q    Are you aware of what the average--so

14   you--let me just make sure I'm understanding.  You

15   asked for the LD classification because she's

16   behind where she's--her grade level that she should

17   be?

18   A    Right.

19   Q    Are you aware of what the average--the

20   student's with your child's disability--how far

21   behind they are average in class?

22   A    No, I'm not concerned--I'm only concerned

56

wtk

1    with my daughter.

2         Q    So, you don't know if being two grade

3    levels behind is average for someone--a student

4    with your--a student comparable to your student

5    gradewise, agewise, disabilitywise?

6              MS. BARRIE:  Objection--[unintell.]

7              MS. CHAPMAN:  I'll withdraw the question.

8              HEARING OFFICER WOODS:  Okay.

9              BY MS. CHAPMAN:

10        Q    Now, let me ask you another question.  You

11   said that you were in attendance at the August 2

12   meeting, do you recall seeing--was the

13   advocate--was there an advocate with you at that

14   meeting?

15        A    Yes.

16        Q    And who was that advocate?

17        A    Ms. Amy Presley [ph].

18        Q    Do you recall seeing Ms. Presley being

19   given the encounter/tracker forms for the '04/'05

20   school year?

21        A    No, because I had stepped out for a

22   moment.

57

wtk

1    Q    You're at the--at that same meeting, was

2    an IEP developed for your daughter?

3    A    It was, but I didn't receive a copy of it,

4    so I'm not aware of what was on the IEP.

5    Q    Well, you are aware of the discussions at

6    the meeting surrounding the IEP?

7    A    The discussion of the meeting was the same

8    discussion on the previous IEP meeting that was

9    scheduled.  They was saying the same thing.  And at

10   that first IEP meeting was for [unintell.] school

11   year and they came back to this table with the same

12   exact thing, was nothing based on--they was still

13   talking about my daughter's behavior, they seen

14   progress in behavior but not once explained to me,

15   okay, her behavior brings on her academic.  They

16   never once discussed the academic.

17         I has to bring up the academic and her

18   behavior.  Her behavior has not progressed and,

19   like I said, Ms. Dukes [ph] wrote a letter at the

20   first IEP meeting stating that it was progress,

21   which my daughter explained to me, she barely saw

22   Ms. Dukes and the speech-and-language assessment--

58

wtk

1    Q    Okay, well that's outside the scope of the

2    question that I was--

3    A    Well, you asked me.

4    HEARING OFFICER WOODS:  The Parent is

5    allowed to explain her answer, are you saying the

6    answer is--the question's been answered?

7    MS. CHAPMAN:  No, I was just--that's okay.

8    HEARING OFFICER WOODS:  Do you want to

9    finish?

10    MS. CHAPMAN:  Yes, I do have additional

11    questions.

12    HEARING OFFICER WOODS:  I mean, can Ms.

13    Gales, she's explaining her answer.

14    MS. CHAPMAN:  Most certainly, that's why I

15    said that's not an issue, go ahead.

16    THE WITNESS:  And, like I spoke, again, I

17    told them how can Ms. Dukes give me and Ms. Presley

18    a letter on T█████ progress when she's never saw

19    her.  And so has Ms. Wendt [ph].  And I--was they

20    going to make up that time that was lost for my

21    daughter.  And they couldn't--like I stated there

22    at the meeting, I'm stating here now, you cannot

59

wtk

1   say that my daughter was progressed in her behavior

2   when I was getting progress reports of my

3   daughter's aggressive behavior towards other

4   students, her aggressive language towards her

5   teachers, which they were claiming she bit another

6   student on the arm and this was just before the IEP

7   meeting before August 2 one.

8           So, in reference to my daughter, they are

9   not doing nothing to meet my daughter's need.  My

10  daughter don't need to be pampered.  She needs to

11  be worked on her behavior and her academic--and

12  especially when it have to come out of my pockets

13  to pay to know where my daughter was.

14          BY MS. CHAPMAN:

15      Q    You mentioned earlier that at the IEP,

16  that there was--at the meeting that there was no

17  change.  Do you recall a discussion about

18  increasing the amount of hours that your daughter

19  would get in her IEP?

20      A    Sure.

21      Q    You said that you had not see the final

22  IEP, but I'd like to show you this document--no

60

wtk

1    that's okay--I'd like to show you this document.

2    Do you recognize that document?

3        A    Yes, I recognize this document because it

4    has my signature at the top.

5        Q    What is that document?

6        A    Identification--that's what it says at the

7    top.

8        Q    I'd like to note for the Record, what has

9    been marked as Exhibit TT-19, which is the August 2

10   IEP.  And I'd like for you to tell me how many

11   hours, at the bottom, it says of--in total of

12   specialized instruction and related services that

13   your daughter will receive based on that IEP.

14       A    Well, I see where Ms. Dukes--

15       Q    Well--

16       A    --wait a minute, she said that they're

17   changing from 22.5 to 32 hours.

18       Q    Mm-hmm.

19       A    And she also a crisis center and I asked

20   her to explain to me what did she mean by center?

21   And she told me that means that T_____ would get 32

22   hours, instead of the 25.5 hours that she was

61

wtk

1   getting.  And I was, like, okay, you talking about

2   hours, but explain to me the center and she

3   mentioned to me for a school.  And she explained to

4   me that it would be a one-on-one with my daughter

5   what she need and it would be a 3.1 ratio which my

6   daughter needs.  And they have a crisis center

7   where they have the teacher that's got a

8   psychologist and a service on site.  And I was,

9   like, right, that is what my daughter needs.

10          And I proposed Accotink and Kennedy Center

11  to them.

12      Q   So, the answer to the question--okay--

13      A   You asked about the 32 hours.

14      Q   Now, can you tell me, then, if that is an

15  increase from the previous year's IEP in terms of

16  hours?

17      A   Yes.

18      Q   So, in fact, there has been a change--

19      A   No.

20      Q   --then, in the IEP?

21      A   Only in the hours.

22      Q   Have you--do you recall, at that meeting a

wtk

1  discussion about placement?

2      A    The placement came up when me and the

3  advocate told them, this is the same discussion

4  that we had at the previous IEP--that meeting was

5  supposed to have been held for placement, they

6  wasn't talking about placement till we reminded

7  them of the previous IEP meeting which they still

8  discussing the same issues.

9      Q    Now, when--

10      A    Then it came up for the placement, because

11  I was, like, they're still stating the same thing

12  from the previous IEP meeting.  So, wasn't no

13  placement brought up until towards the end of the

14  IEP meeting.

15      Q    And what was--you mentioned what you and

16  the advocate brought up.  What was the discussion

17  or the response from DCPS regarding placement?

18      A    Nothing.

19      Q    So, at any point in the meeting, did

20  anyone from DCPS say that the placement would--that

21  a meeting for a placement would happen at a later

22  date?

63

wtk

1    A   They would come back, yeah, to discuss

2  placement.

3    Q   So there was a response to you about

4  placement?

5    A   Right--

6    Q   Okay.

7    A   --towards the end of the meeting.

8    Q   So, you--

9    A   The meeting was ending finally because we

10  had to talk about that at the previous IEP meeting,

11  they was discussing the same thing and they still

12  was saying that they could meet my daughter's

13  needs, which they can't because she's still on a

14  first-grade reading level and she's been there two

15  years.

16    Q   The next question--

17    A   And her behavior wasn't changed.

18    Q   The next question I'd like you to answer

19  and yes or no, please.  So, your previous answer

20  that there was no communication to you by DCPS

21  regarding placement was untrue?

22    A   Excuse me?  Explain--oh, no, like I stated

64

wtk

1    first--

2        Q    Yes or no?

3        A    --at the end of the meeting, so, no, until

4    the end of the meeting.

5        Q    But I didn't specify in terms of when in

6    the meeting.  In the entire meeting while you were

7    there, your previous answer was that no DCPS

8    personnel said anything to you about placement.

9    You later then testified that they did say

10    something about placement.  So, I'm asking you,

11    that first statement was incorrect, yes or no--just

12    a yes or no.

13        A    No, I was saying--the statement I made

14    wasn't incorrect, I told you the first time, they

15    only brought it up at the end of the meeting when

16    we reminded them that they was talking about still

17    stating the same thing from the first IEP meeting,

18    her behavior.

19        Q    But my question didn't--wasn't limited to

20    who brought it up or why brought it up, the answer

21    was specifically, after you and the advocate

22    brought up the issue of placement, did anybody from

65

wtk

1    DCPS--

2         A    No--

3         Q    --communicate to you about--

4         A    --No.

5         Q    Well, the witness has, at this point,

6    impeached herself because she's--it's on the Record

7    and I'd like to--

8         A    No, you weren't here--

9         Q    --to make a motion at this time that she

10   not be allowed to testify.  And that her testimony

11   be stricken.

12        A    Oh, what--

13             HEARING OFFICER WOODS:  Not be able to

14   testify?

15             MS. CHAPMAN:  Well, the--due to

16   impeachment, because the question I specifically

17   asked was, after you and the advocate brought up

18   the issue of placement, did any member from DCPS

19   communicate to you about placement.  Her answer

20   was, no.  Then in a follow-up, different question,

21   she did acknowledge that DCPS did say that they

22   were going to reconvene to discuss placement.  So,

66

wtk

1  in going--

2          THE WITNESS:  At the end of the meeting.

3          MS. CHAPMAN:  --so, in going back and

4  asking her if that first statement was untrue she

5  then said, no, that statement is true.  And I'm

6  saying that the witness has, at this point,

7  impeached herself--and not be able to testify.

8          HEARING OFFICER WOODS:  Why would she

9  not--I don't understand that part--

10         MS. CHAPMAN:  Because of, I mean, because

11  she has lied on the Record.

12         THE WITNESS:  No, I did not.

13         HEARING OFFICER WOODS:  Ms. Barrie, any

14  response?

15         MS. BARRIE:  If I may.  I believe that the

16  Parent answered the question appropriately.  There

17  was no lying that took place.  The question was,

18  did anybody from DCPS discuss placement.  And she

19  said, no.  Then she said at the end they said they

20  were going to reconvene to discuss this.  So, yes,

21  she answered the question, both questions.  She

22  didn't lie, they did not discuss placement, they

wtk

1    said they would reconvene.  That's one.  Number

2    two, she did indicate at the end, that, yes, they

3    said they were going to reconvene, but there hasn't

4    been a discussion of placement.  Nobody offered,

5    no--just, obviously no offer of placement and the

6    notes are clear, there was no discussion of

7    placement.  So, she didn't respond.

8         MS. CHAPMAN:  If I could respond, the

9    question was, specifically, after you and the

10   advocate brought up the issue of placement did

11   anybody from DCPS communicate to you about

12   placement--it wasn't did they discuss placement, as

13   in placement discussion, it was, was there any

14   communication about placement?  The answer was no.

15   Then, later, she then said that they did

16   communicate to her about placement by saying that

17   they were going to reconvene to have a placement

18   meeting which is in direct contradiction of her

19   prior testimony.  Then, when I went back and asked

20   her if the--about the prior testimony she said that

21   that stood, as well.  So, those two statements

22   cannot coexist without--I mean one of those

68

wtk

1  statements is untrue.

2              HEARING OFFICER WOODS:  Go ahead, I'm

3  sorry.

4              MS. BARRIE:  If I may, Those are two

5  different things, that they--what was the question?

6              MS. CHAPMAN:  Did they communicate to you

7  after they brought it up?

8              MS. BARRIE:  [unintell.] placement

9  [unintell.] placement, the answer is clear, it is

10  no, they didn't.  What they did was say they were

11  going to reconvene for a placement meeting.  So,

12  the only communication about placement was about a

13  placement meeting.  So, the mother did not lie, she

14  was clear on both counts.  And she explained both

15  of them.  She did not--nothing was muddled, it was

16  no they did not communicate to me about placement.

17  All they said to me was they were going to

18  reconvene.  That's it.

19              MS. CHAPMAN:  Well, I'd also like to say

20  that even in going back that there was--it was a

21  lie because after communicating about it, then, she

22  then changed her statement and said, well, I said,

69

wtk

1   no, it was at the end of the meeting.  And they

2   didn't discuss it until after we brought it up.

3   And that's why I came back and said, no, my

4   original question:  one, it was covering after you

5   brought it up by saying after you and the advocate

6   raised this issue.  And, furthermore, it was if

7   there were--so that's irrelevant in coming back

8   into the answer.  The question did not specify or

9   say at what point in the meeting.

10          HEARING OFFICER WOODS:  Okay.

11          MS. CHAPMAN:  And it was very specific in

12  the question.  She testified that she and the

13  advocate brought it up.  So, therefore, my question

14  was after you and the advocate brought it up.  Then

15  her further response--after when she said, yes.

16  She said, well that was only--they talked about it,

17  but only after we brought it up at the end of the

18  meeting.  Again, a contradiction.  Because that

19  wasn't my question.

20          HEARING OFFICER WOODS:  Let me because

21  I--so you can use your time, I know you have a

22  hearing and Ms. Barrie may have one.  The basis for

wtk

1  the objection is because the mother's testimony has

2  been impeached she could not testify.

3        I'm unaware of any authority that would

4  preclude the mother from testifying on that

5  grounds.  So, I would have to deny on that basis--

6        MS. CHAPMAN:  Okay,

7        HEARING OFFICER WOODS:  --and, if the

8  mother said things that were contradictory, of

9  course, the Record would reflect that.  But the

10  other thing may be that she's unclear of the

11  question.  So, if you want to make it clear because

12  I don't want the mother to think that this is, I

13  got you, I mean, she's not here to be had.  She's

14  here to advance her case.  And if she answers that

15  may seem inconsistent, that partly could be, yeah,

16  there's an inconsistency or it could be that she

17  doesn't understand the question.

18        MS. CHAPMAN:  Well, I certainly don't

19  think that this is a forum to get or have the

20  Parents, either.

21        HEARING OFFICER WOODS:  Yes.

22        MS. CHAPMAN:  I mean, that's certainly not

71

wtk

1  DCPS's position.  However, I do know that any

2  Parent, including this Parent that comes down here,

3  they are required to be honest and tell the truth

4  about what they feel is happening on behalf of

5  their student and of their child.  And I did ask

6  the same types of questions in different ways more

7  than once just to clarify, in case there was any

8  type of ambiguity or misunderstanding.

9        And the Parent was very emphatic in her

10  testimony and in her responses.  So, and at this

11  point with all the discussion going back and forth,

12  I wouldn't feel comfortable asking the question

13  again because I do think that my initial statement

14  stands and I don't think that the testimony would

15  be forthcoming anyway.

16        HEARING OFFICER WOODS:  You, go ahead, I'm

17  sorry, I was going to say you could allow--make

18  argument at the conclusion--

19        MS. CHAPMAN:  Right, which I will.

20        HEARING OFFICER WOODS:  --but in terms of

21  the mother's ability to--

22        MS. BARRIE:  I will object to that on

72

wtk

1    the--the main purpose being that the mother is part

2    of this hearing and she's allowed to present her

3    case truly and through her testimony is the way she

4    can present her case truly.  That's one, number

5    two, I don't believe a witness [unintell.] even a

6    mother or anyone else can be prevented from

7    testifying, even if they did lie on any question.

8    Even if it's blatant and obvious that a witness has

9    lied.  That answer may be stricken because they

10   have lied.  And the Hearing Officer may then take

11   into consideration whether that person's testimony

12   has been impeached, whether or not the person's

13   testimony were even were [unintell.] at the time of

14   decision making.  But I do not believe that a

15   witness, either the mother or anyone else, can

16   [unintell.] testifying, even if they did lie.  So,

17   therefore, I would object to the Parent being asked

18   to not testify in this matter.

19        HEARING OFFICER WOODS:  And that objection

20   would be, therefore, overruled--

21        MS. CHAPMAN:  Okay.

22        HEARING OFFICER WOODS:  --I would agree, I

73

wtk

1  can't see any reason why the mother would be

2  precluded from the proceeding.

3       MS. CHAPMAN:  Okay.

4       HEARING OFFICER WOODS:  You may want to

5  ask those questions again, that's her choice, but--

6       MS. CHAPMAN:  All right.

7       BY MS. CHAPMAN:

8    Q    Moving on; then, in terms of the--let me

9  ask you then what your--what you've seen, I don't

10 know if you need to look at a copy of it, again,

11 what your objections are or what problems you have

12 with the current IEP in terms of its goals and

13 objectives?

14      HEARING OFFICER WOODS:  Let's get the mic

15 back in front of Ms. Gales?

16      MS. BARRIE:  If I may, I'll have to

17 object, no one, because the mother's, they're not

18 experts on IEP or what the goals should or should

19 not be.  What their concerns are, when they go to

20 an attorney is, my child is not doing well, please

21 tell me why and can you help me get her what she

22 needs.  And our goal is to look through all the

74

wtk

1  documentation and figure out what is wrong with

2  whatever it is the child's being provided.

3      The person who can answer a question as to

4  whether a goal is inappropriate or not would be an

5  expert or someone who is knowledgeable on IEPs and

6  service a student with Tiara's disability, ED, ADHD

7  can provide or, rather, should receive in the IEP.

8  So, I don't believe the mother can really testify

9  to appropriateness to the goals and objectives in

10  an IEP.  Counsel and I know that [unintell.] if a

11  child's not progressing and they're not giving her

12  all the services because she--they cannot see the

13  services being provided.

14      MS. CHAPMAN:  If I can respond, this whole

15  complaint was initiated, presumably, by the Parent,

16  the Parent is aware of all of the issues being

17  raised.  The attorney is merely a vessel of the

18  Parent and their initial concerns.  And in how the

19  problem--how you would like to see the problem

20  corrected, one of those things is an appropriate

21  IEP.

22      So, therefore, and the mother has

wtk

1   presented through testimony, to be very

2   knowledgeable.  She was able to talk about the

3   ratio of the type of setting that she wanted her

4   student in; talked about her reasons as to why she

5   didn't want her daughter to be on medication for

6   ADHD; and she even made reference to other children

7   that she had seen with that same classification on

8   that medication.

9        She has been--she has participated in the

10  IEP meetings, as evidenced by her attendance in all

11  the meetings and is very vocal about placement and

12  what was discussed at the meeting.  So, therefore,

13  DCPS asserts that I'm not asking for expert

14  testimony in terms of IEP goals and objectives, but

15  as in her opinion, as the Parent, she's the one

16  that raised the claim, what her problems are with

17  the IEP.

18       MS. BARRIE:  If I may, in reference to the

19  ratio, she indicated that the social worker, the

20  counselor at the school indicated to her what her

21  ratio to the student would be in need of.  As far

22  as the medication, she's not an expert on

76

wtk

1    medication; all she can speak of are children that

2    she has seen who are affected by medication and, as

3    any parent, she's concerned that they may happen to

4    her child.  And that is all she's speaking to, not

5    as to whether or not she knows that that's what

6    would happen or even though, as far as the

7    student/teacher ratio, all she does know is that

8    her daughter does not seem to work well with too

9    many kids in the classroom, in reference to the

10   ratio.

11            But I believe that, as far as to whether

12   the goals are appropriate, I think that is actually

13   a question that, even here, as attorneys

14   COMMISSIONER MASON:  we are not even allowed to

15   speak of however the goals are appropriate because

16   the question would be to an attorney what do you

17   know about IEPs?  We make references, but know at

18   the time Hearing Officers usually face off and say,

19   well, you really can't talk about goals and

20   objectives because you're not an expert in

21   education, neither is the mother.

22            MS. CHAPMAN:  I didn't ask her if the

77

wtk

1  goals were appropriate, I asked her what her

2  concerns were with the goals and objectives, since

3  that is an issue that is raised. And, as I said,

4  I'm not asking for expert testimony. I'm only

5  asking, as a parent and as an active participant in

6  the MDT/IEP team what her concerns were?

7        HEARING OFFICER WOODS: I will overrule

8  the objection on this ground: the purpose for the

9  MDT meeting is for the mother to participate in the

10 development of the IEP. And one of the things that

11 would be helpful is to know if the mother who

12 participated in the development of this IEP had

13 some concerns about the document as it was written.

14 And, of course, one of the major portions of the

15 IEP are its goals and objectives. To the extent

16 that Ms. Gales is unaware, that's fine, if you

17 don't know, but it does seem a fair question,

18 particularly--and I'd add to that, particularly in

19 light of the fact that Ms. Gales was prepared to

20 discuss placement and she had her proposed

21 placements and I would assume that would be based

22 on her understanding of what this child's needs

324

wtk

1  were and that's why you thought those other schools

2  would be a better place.

3        So, just to the extent you understand

4  this, but don't feel like you have to figure it

5  out.  I mean, don't--well, this one means this, no.

6  She--basically the broad question is what are your

7  concerns about this particular document as it was

8  drafted.  And she was specifically referring to, I

9  think, the goals and objectives, which are, do you

10  want to point to--

11        MS. CHAPMAN:  Right and I can even make it

12  even more, because, like I said, I'm not asking for

13  expert testimony, I'm just asking that, at the

14  meeting when--as this IEP was being developed, can

15  you tell me what your concerns were with the

16  specific, if any--if you had none, then that's

17  fine--with the specific things that they were

18  putting in this IEP to implement?  Not where it was

19  going to be implemented, anything like that, just

20  the specific things that this IEP called for.

21        THE WITNESS:  Okay, when they was writing

22  this IEP up--I can't answer that question because I

wtk

1  left.

2          MS. CHAPMAN:  Okay.  That's okay.

3          THE WITNESS:  The advocate sat through

4  this, and that's something I cannot answer-- Okay.

5          THE WITNESS:  And they told Ms. Presley

6  that they would send her a copy of the IEP and Ms.

7  Presley told them, no, she needed that IEP before

8  she left the meeting.  And Ms. Presley asked them

9  to send my copy to the [unintell.]

10          BY MS. CHAPMAN:

11      Q    Okay, and have you received a copy of the

12  IEP to date?

13      A    Not yet.

14      Q    Are you aware if your attorney has a copy

15  of the IEP?

16      A    Yes, I am.

17      Q    But you've not gotten one from her,

18  either?

19      A    Not yet.

20          MS. CHAPMAN:  Well, then that question is

21  gone.  Actually, I have no further questions, thank

22  you very much.

wtk

1        HEARING OFFICER WOODS:  Ms. Barrie?

2        MS. CHAPMAN:  Before you start, I just ask

3   you, in terms of the time, since she's going to do

4   cross and then she was going to move into

5   direct--how would we--

6        HEARING OFFICER WOODS:  I'd like to finish

7   if we can.

8        MS. BARRIE:  And I have an 11:00 o'clock

9   at Whittier.

10       HEARING OFFICER WOODS:  Oh, at Whittier,

11  what would you all prefer doing?

12       MS. BARRIE:  I don't want to continue this

13  because school starts in three weeks.

14       MS. CHAPMAN:  I know that I cannot--I'm

15  not; one I've got an 11;00 o'clock and my 1:00

16  o'clock is at Whittier and I know that I can't go

17  too much, I mean I would want to do the cross.  I

18  wouldn't be able to go much beyond that, just in

19  terms of the time.  I haven't even--yeah, I mean,

20  at this point, I probably would need to--both of us

21  would probably need to let your 11:00 o'clock at

22  Whittier, but I would have to let my 11:00 o'clock

81

wtk

1  know that I'm here, I'm just going to be a few

2  minutes late, if that's okay.  And then--

3          HEARING OFFICER WOODS:  I'm prepared--I

4  have an 11:00 o'clock, too.  I'm prepared to finish

5  this case or do whatever the parties direct me to

6  do, to be honest with you.  Because it would

7  appears it would be this witness and Ms. Millis.

8          MS. BARRIE:  I need to finish this case

9  only because it's been going on for so long.  And I

10  can see if I can contact--

11          HEARING OFFICER WOODS:  And just tell them

12  if they could hold it till, maybe--

13          MS. BARRIE:  Right, and I know she's

14  willing to wait for me because she was aware of the

15  fact that I--the Hearing Officer, that is, I had a

16  hearing at 9:00 and I'm coming from here and if

17  worse come to worse, I can always ask for that one

18  to be continued.  Because for me, this is more of

19  an emergency.

20          MS. CHAPMAN:  Well, then I would ask for a

21  recess for me to be able to contact my 11:00

22  o'clock to see what I can do with that.

82

wtk

1          HEARING OFFICER WOODS:  And, also the

2   other thing is to look at this case.  I mean,

3   again, I if I'm not going to have my witness, what

4   am I going to do.  I mean, again, we've got to get

5   this thing resolved.

6          MS. CHAPMAN:  Well, I mean, I haven't

7   rested and, as I said, after you finish with the

8   mom, I was going to call my witness back again.  If

9   she's not--if she's still not available, then I

10  will have rest, but I've not conceded that point,

11  as of yet.

12         HEARING OFFICER WOODS:  Okay.

13         MS. CHAPMAN:  Because DCPS has not rested.

14         HEARING OFFICER WOODS:  Okay, how

15  many--how much, five minutes?

16         MS. CHAPMAN:  Well, what I'm going to do

17  now is run to the Hearing Officer of my 11:00

18  o'clock and just say that I'm still in this.  So

19  that they won't--

20         HEARING OFFICER WOODS:  That's fine.

21         MS. CHAPMAN:  --move forward or dismiss it

22  without me.

83

wtk

1          HEARING OFFICER WOODS:  Want me to do that

2   for you?

3          MS. CHAPMAN:  Sure, you'd probably have

4   more weight than I would.

5          HEARING OFFICER WOODS:  Right.  That way

6   we can keep going.

7          MS. CHAPMAN:  Right, and then, I'll call

8   while--

9          HEARING OFFICER WOODS:  Get your person.

10  but they'd have to hold up.

11         HEARING OFFICER WOODS:  How much time do

12  you think you'll need for--

13         [Break.]

14         HEARING OFFICER WOODS:  Okay, we're back

15  on the Record.  Ms. Barrie, it's your

16  cross-examination.

17                CROSS-EXAMINATION

18         BY MS. BARRIE:

19     Q    Okay, Ms. Gales, you indicated that you

20  refused the meds because the kids that you have

21  seen are like zombies, correct?

22     A    Correct.

84

wtk

1     Q    Did you, however, refuse a psychiatric

2    evaluation for her?

3     A    No.

4     Q    Did anyone address your concern about her

5    being two to three levels below grade level right

6    now, during the meeting?

7     A    When I brought it up.

8     Q    What did they say?

9     A    They had a psy--

10     Q    Psychologist?

11     A    --psychologist there, but it wasn't Dr.

12    Jones. She used the evaluation that I assumed that

13    they already had plus the one from Sylvian [ph],

14    the one that I paid for.

15     Q    Okay.

16     A    She said they was basically running the

17    same, that ████ was below average.

18     Q    You said you know about the aggressive

19    behavior towards staff and peers. How did you find

20    out about the aggressive behaviors towards the

21    staff and peers?

22     A    Progress reports sent home from her

85

wtk

1    teacher was based on 100 points.    T████ has brought

2    home one with 50 points, zero points and explained

3    why her points was that low.

4           When she got one for the 50 points is when

5    she used aggressive behavior towards another peer

6    which she hit with the keyboard and she--

7           Q    She hit the peer with the keyboard?

8           A    --the keyboard of the computer.   And

9    another one she brought home was, like, 60 points,

10   that was aggressive language towards her teacher

11   stating to her she hated her.   And temper tantrums

12   and refusing to do what she needed to do.   So,

13   right after that, it came another IEP meeting,

14   that's why I didn't pay to much attention to Ms.

15   Duke's letter that she had wrote that it came right

16   after T██████ behavior and she said she progressed.

17          Q    Okay, you had said earlier that T████ said

18   she hardly sees her.

19          A    Correct.

20          Q    Did--

21          A    I stated that--

22          Q    --right, did T████ arrive or did T██████

86

wtk

1    come home and say, I don't see Ms. Dukes?

2        A    Right, and the speech-and-language.

3        Q    And the speech-and-language.  During the

4    meeting, did DCPS propose to you any particular

5    school that may be able to service T████--did they

6    offer you any schools that may be of service T████?

7        A    No, I don't want to be called a liar

8    anymore, so I want to be very careful and think.

9        Q    Besides a Center.  Besides saying she

10   needs a Center?

11       A    No, because I proposed a school first.

12       Q    Mm-hmm.

13       A    Let me get it correct.l

14       Q    Okay.

15       A    I proposed the two schools first.  Ms.

16   Dukes asked me was J.O. Wilson my daughter's school

17   in my area.

18       Q    Neighborhood school.

19       A    Where I'm living, a neighborhood school?

20       Q    Uh-huh.

21       A    And I stated to her, yes.  Ms.--that was

22   my daughter's neighborhood school.  And she also

wtk

1   stated that she wanted to get in contact with

2   someone at J.O. Wilson because, I can't remember

3   after that because she left the office.  So, when

4   she came back she said she couldn't get in contact

5   with the lady named Ms. Foster [ph] or someone at

6   J.O. Wilson.  And that's how all this came about is

7   when I brought up about--me and Ms. Presley brought

8   up about placement.

9       Q    And when you proposed your school, did

10  they say they had a therapeutic school for her?

11      A    No, they did not.

12      Q    When you proposed your school, what did

13  they say?  I mean did they give you a reason why

14  they're not going to place her at the school that

15  you had even though they didn't have one?

16      A    Because they was at the I proposed the

17  school and Ms. Dukes mentioned about J.O. Wilson,

18  they was still saying that Payne could provide

19  T█████ needs and I stated Payne could not provide

20  T████ needs because she been her two years

21  academically she's still at the same level,

22  behavior part she's still where she was at when she

88

wtk

1  came.

2      Q    When you said you had to pay to know her

3  level, what do you mean?

4      A    Because no one--her special-ed

5  teacher--she had two special-ed teachers there.  It

6  was Mr. Williams [ph], at first; which I had to

7  constantly run back and forth up there.  None of

8  them could provide what actually grade level that

9  T̄ was.  I was assuming my own daughter's grade

10  level until I'm like get it, let me go to Sylvian

11  and have them also test my daughter, which I paid

12  them $175, I provided all of that to her special-ed

13  teacher.  I gave the special-ed teacher a copy and

14  I also provided Payne with a copy of that.

15          I could not have, but I did.  And I let

16  her teacher know this is where she's at and this is

17  what you and I can work on.  I took the

18  Dick-and-Jane book from a regular reading book,

19  which me and Ms. Wilson tried our best to work with

20  T̄ on that.

21          So, we both tried to work with it.  Even

22  Ms. Wilson at the IEP meeting, the previous before

89

wtk

1   the August 2, she agreed, in the meeting, that

2   T████ cannot retain the information that she does

3   need to be placed where she needs one-on-one.   I

4   even asked for a tutor, DCPS denied that because

5   they was offering her extended school year.

6           MS. BARRIE:  No more questions.

7           MS. CHAPMAN:  I just have three quick

8   things on redirect.

9           HEARING OFFICER WOODS:  Okay, Ms. Chapman.

10                  REDIRECT EXAMINATION

11          BY MS. CHAPMAN:

12      Q   Ms. Gales, Rashida Chapman, again.  I just

13  have a few questions for you.  You--not only did

14  you not refuse a psychiatric, you didn't request

15  one, either, correct?

16      A   No, I didn't request one.

17      Q   You also said that--on cross, you

18  mentioned that they did not tell you that they

19  had--DCPS did not tell you that they had a

20  therapeutic placement.  Did they tell you that--did

21  they tell you that they did not have a therapeutic

22  placement, that they had no placement or did they

wtk

1    just not propose a therapeutic placement at that

2    meeting?

3        A    No because all they told me was that they

4    could still provide T██████ needs.

5        Q    The last think I'd like for you to--it's

6    the IEP again, that I referred you to, which has

7    been entered into the Record and labeled as Exhibit

8    TT--I'd like to note for the Record that I am at

9    the seventh page of the actual meeting notes.    And

10   I'd like for you to read from here to this star

11   right here, read what that's from the meeting

12   notes.

13       A    And I also stated to you, when they was

14   writing and discussing this, I was not there, so

15   this cannot tell you what was discussed.

16       Q    I'm not asking you what was discussed, I'm

17   asking you to read what is right there.

18       A    And that had to be discussed between the

19   advocate and whoever was discussing that, so I

20   cannot say--I cannot read that because as far as

21   that to me is hearsay because I wasn't there.

22       Q    Have you read it already?  How do you know

wtk

1    what it says, you haven't even looked at it.

2         A    I don't know what it says, but if they

3    discussed it, I cannot, if I read it, I can't tell

4    you if they discussed it.

5         Q    Well, I'd just like to, then note--

6         A    But I'm just saying, you know, I was not--

7              HEARING OFFICER WOODS:  Yes, ma'am--

8              THE WITNESS:   --they was further

9    discussing things as they was wrapping it--wrapping

10   up the IEP when Ms. Presley stated--when Ms. Smith

11   stated that she would give--mail Ms. Presley a copy

12   of the IEP, Ms. Presley stated to them, no, she

13   needed it before she left and she would mail me my

14   copy.  And they still, things were still being

15   discussed of what they needed to put on and I left

16   to go back to my employment.  So, I can't answer

17   yes or no to that.

18         BY MS. CHAPMAN:

19        Q    Well, as I said, I wasn't asking you a yes

20   or no answer, I was simply asking you to read what

21   was in the notes.  And I would also like to state

22   for the Record, that the witness has acknowledged

wtk

1    that her counsel does have a copy of the IEP and

2    that at the meeting that they told her that they

3    would send a copy to her lawyer's office to give to

4    her.

5            So, the fact that she doesn't have a copy

6    is not any fault of DCPS.

7            THE WITNESS:  From here to here?

8            MS. CHAPMAN:  Right.

9            THE WITNESS:  DCPS will come back to the

10   table to discuss placement.  The Parent and

11   Advocate recommended Accotink Academy and Kennedy

12   Institute as possible placement.  DCPS placement

13   and these schools will be discussed at the

14   placement meeting.  You didn't ask me that.

15           MS. CHAPMAN:  Thank you.  Okay.

16           THE WITNESS:  You didn't ask me that.

17           MS. CHAPMAN:  I know because I only asked

18   you to read, that's what I asked you.

19           HEARING OFFICER WOODS:  What was--where's

20   that?

21           MS. CHAPMAN:  This was on the seventh page

22   of the actual meeting notes of Exhibit 19, it's the

wtk

1   page right before the letter of invitation, right,

2   I think this is it right here.

3           HEARING OFFICER WOODS:   You're done?

4           MS. CHAPMAN:   Yes.

5           HEARING OFFICER WOODS:   Anything further

6   from this witness at this time?

7           MS. CHAPMAN:   Nothing further.

8           HEARING OFFICER WOODS:   What's your

9   pleasure in terms of how we proceed?  Do you want

10  to go back to your case-in-chief?

11          MS. CHAPMAN:   I would like to, I mean,

12  just given the time, but--

13          HEARING OFFICER WOODS:   Okay, let's get

14  your witness on the phone.   This is DCPS's first

15  witness, Ms. Gales.

16          [Break.]

17          HEARING OFFICER WOODS:   Let's proceed.

18          [Phone call placed.]

19          HEARING OFFICER WOODS:   Ms. Smith?

20          MS. SMITH: Yes.

21          HEARING OFFICER WOODS:   This is Fred

22  Woods, the Hearing Officer.   We're in the

wtk                                                                94

1    due-process hearing for T█████ T█████.    And present

2    in the room with me is also, in addition to Ms.

3    Chapman is Ms. Barrie, the attorney for the mother,

4    and the mother, Ms. Gales is here, as well.    We're

5    prepared to receive your testimony.

6              Whereupon,

7                      ELAINE SMITH

8    was called as a witness and, having been first duly

9    sworn by the Hearing Officer was examined and

10   testified as follows:

11             HEARING OFFICER WOODS:    Ms. Chapman, you

12   may proceed.

13                   DIRECT EXAMINATION

14             BY MS. CHAPMAN:

15        Q    Hi, Ms. Smith, Rashida Chapman, again. I'd

16   like for you to state your full name for the

17   Record, please.

18        A    [unintell.] Elaine Smith [ph].

19        Q    And who are you employed by?

20        A    D.C. Public Schools at Payne Elementary.

21        Q    What is your position with D.C. Public

22   Schools?

1      A    Special-education coordinator.

2      Q    Can you tell me how long you have had this

3    position with D.C. Public Schools?

4      A    Since January of 2004.

5      Q    Can you describe to me what your duties

6    are as the special-education coordinator?

7      A    I'm the person responsible for the MDT

8    team at Payne Elementary School in terms of I work

9    with the psychologist, social worker, speech

10   therapist, special-education teachers to ensure

11   that the special-education students are receiving

12   their services and, also, to ensure that the IEP is

13   being implemented.

14     Q    Can you tell me if you are familiar with

15   the student T▓▓▓ T▓▓▓?

16     A    Yes, I am.

17     Q    How are you familiar with the Student?

18     A    T▓▓▓ T▓▓▓ is a student in our ED program

19   and has been since last year.

20     Q    If you could clarify--is that, what school

21   year did she start at that program?

22     A    I believe it would have been, 2004/2005

wtk

1    and I believe, also, 2003/2004.

2        Q    Let me ask you, have you attended any IEP

3    meetings on behalf of this student?

4        A    Yes, I have.

5        Q    Can you tell me what the most recent IEP

6    meetings were?

7        A    We just had a meeting on August 2.  And

8    prior to that meeting we had a meeting on April 29.

9        Q    Can you tell, in either of these meetings

10   did the Parent request a psychiatric evaluation?

11       A    No, a psychiatric evaluation was never

12   requested, but we had discussed the--there was a

13   previous psychiatric that was completed by Dr.

14   Mallis on June 5 of 2002, and DCPS reviewed that

15   information and a clinical psychiatric which was

16   dated May 7, 2003, and there was also a clinical

17   review done, October 1, 2003, so all of those

18   reports were reviewed in April. And we also

19   discussed that on August.

20       Q    Was there any discussion, then, about

21   medication for the student in either of those

22   meetings?

1      A    Yes, the psychologist who reviewed the

2   evaluations that I was speaking of?

3      Q    Yes.

4      A    She discussed the need for the child

5   possibly needing to be on medication.  Because she

6   went over all that information with the Parent as

7   to how the medication would impact her.  And well,

8   how her not having medication impacts her memory

9   and her making progress.  But the mother was

10  opposed to any medication.

11     Q    What would the medication--if you recall

12  from the discussions, what were the

13  medications--what was the proposal of the

14  medication to address?

15     A    The medication was to deal with, seems

16  like she was talking to the mom about how it would

17  assist her, I guess, with her memory; I guess, with

18  staying focused and it would help her to make

19  progress, I guess, academically and behavioral.

20     Q    At the most recent meeting, which I

21  believe your testimony happened on August 2, can

22  you tell me if any encounter/tracker forms for the

wtk

1    '04/'05 school year were produced and provided to

2    either the Parent or a representative of the

3    Parent?

4         A    Yes, Ms. Presley was given the

5    encounter/tracker forms for the 2004/2005 school

6    year for all services, that included the child

7    being seen by Dr. Jones, school psychologist; she

8    was seen by the social worker, Ms. Dukes, and she

9    was seen by Ms. Wendt the speech therapist.  So,

10   all those people produced copies of their Medicaid

11   for the 2004/2005 school year to show that services

12   were provided.

13        Q    Do you recall, at the most recent IEP

14   meeting, the Parent raising any objection to the

15   goals and objectives of the IEP?

16        A    No, because when the team asked if there

17   were any additional changes that needed to be made

18   to the IEP, basically, they didn't have any

19   additional changes.

20        Q    When you say they, who are you referring

21   to?

22        A    The Parent and advocate.

wtk

1    Q    Now, at the meeting, did DCPS make any

2    statements about placement or a placement meeting?

3    A    We discussed--we changed the child's

4    number of hours of--

5    Q    Let me just stop you, really, quickly, if

6    you need to refer to any notes or anything to

7    refresh your memory, just let me know and let me

8    know what it is that you need to refer to so that I

9    can ensure that that document is already in the

10   Record.

11   A    I'm going back to the IEP meeting notes.

12   Q    From what day?

13   A    August 2.

14   Q    Let the Record reflect that the witness is

15   referring to Exhibit TT-19.  Go ahead.l

16   A    And in here, I see that the Student's

17   needs can be addressed at a full-time therapeutic

18   center; IEP will be forwarded to site review

19   consideration team and then we'll come back to the

20   table to discuss placement.  The Parent's advocate

21   recommended Accotink Academy and Kennedy Institute

22   as possible placements.  But DCPS placement, as