100

wtk

1    well as those schools will be discussed at the

2    meeting once we receive a placement.

3        Q    So, has DCPS, have you all convened--since

4    August 2, have you all convened a placement meeting

5    on behalf of this Student?

6        A    No, not yet.

7        Q    Did the issue of compensatory education

8    come up at the most recent IEP meeting?

9        A    No, it came--yes, it came up in the form

10   of the fact of her receiving her services this

11   school year, but that's why the encounter/tracker

12   forms were produced to show that the Student had,

13   in fact, received all services indicated on her

14   IEP.

15        MS. CHAPMAN:    Thank you, I actually have

16   no further questions for Ms. Smith.    Thank you very

17   much.

18        HEARING OFFICER WOODS:    Okay, Ms. Smith,

19   I'm sorry, yeah, Ms. Smith, Ms. Barrie is to ask

20   questions.

21        THE WITNESS:    Okay.

22            CROSS-EXAMINATION

wtk

1          BY MS. BARRIE:

2      Q    Can you hear me?

3      A    Yes.

4      Q    How are you doing?

5      A    Fine, how are you?

6      Q    Good.  Real quick:  You indicated that the

7  psychiatric evaluation was completed on June 5,

8  '02?

9      A    Yes, that one was completed by Center for

10  Mental Health, Dr. Mallis.

11      Q    Has that evaluation expired?

12      A    Yes, therapeutic was another clinical,

13  there was a clinical psychiatric review that was

14  done dated May 7, '03.

15      Q    Is that a review of the evaluation or was

16  that new evaluation that was completed in 2003?

17      A    I believe that was a review where they

18  reviewed, like, previous evaluations that had been

19  done.  And I believe that they reviewed that

20  information from Dr. Mallis.  DCPS did the clinical

21  psychiatric exam.

22      Q    Okay, so it's just somebody who takes the

102

wtk

1    psychiatric evaluation, reads it and writes a

2    report on it?

3        A    They review, yeah, they reviewed the

4    outside information.

5        Q    And you indicated that the psychologist

6    discussed possible medication to address for T_____,

7    correct?

8        A    Mm-hmm.

9        Q    Can a psychologist recommend medication?

10       A    No, psychologist can't, so that's why,

11   also the Parent was referred to--what's the name of

12   the program?  Community Resources Program, but, at

13   the time, the Parent refused services because the

14   child was participating in the Center for Mental

15   Health.

16       Q    At the school.

17       A    So, no, they just recommended that

18   medication might possibly help her.  Of course,

19   that would have to go through a psychiatrist.

20       Q    So, then, why did DCPS not refer her for a

21   DCPS psychiatrist to do a psychiatric evaluation to

22   determine, instead of sending her to community

wtk

1  service program?

2      A    Because, at the time, the mother said she

3  did not want the child on any medication.

4      Q    But did anyone explain to her--well, did

5  anyone ask her why she did not want the child on

6  medication?

7      A    I can't recall that at this time, but I

8  know that the psychologist explained to her why it

9  would be a good idea for the child to be on

10 medication [unintell.] could possibly help, because

11 the psychologist who spoke with the Parent is both

12 the clinical psychologist.

13     Q    Did they--well, I'm not sure if they can.

14 Can they discuss the side effects or not of any

15 particular medication for T████?

16         MS. CHAPMAN:  Who is they?

17         MS. BARRIE:  The psychologist, I'm sorry.

18         BY MS. BARRIE:

19     Q    The psychologist can't really discuss what

20 the side effects may or may not be for T████,

21 correct?

22         MS. CHAPMAN:  I'm going to object--hold

wtk

1   on, Ms. Smith.  I'm going to object on the basis

2   that the question was already asked and answered as

3   to whether or not the psychologist can dispense

4   medication.  So, I would move that whether or not

5   they can discuss the medication falls under the

6   umbrella their inability to dispense the medication

7   and, therefore, have knowledge of he medication.

8          HEARING OFFICER WOODS:  Any--

9          MS. BARRIE:  The question goes directly to

10  the witness testifying that the psychologist spoke

11  of the benefit of T▬▬ being medicated.  But if

12  they can speak to the benefit of her being

13  medicated and the mom is objecting, then the

14  natural thing would have been to find out why the

15  mom was objecting and maybe notify the mom what

16  some children how it affects them and then how it

17  does not affect other children.  But this goes to

18  the clarity that the only person who can do that is

19  a psychiatrist.  But, in order for that to happen,

20  it has to go psychiatric.

21         HEARING OFFICER WOODS:  Was that the--I

22  don't know if you're going to tie that with

wtk

1  evidence, the basis for the mother's rejection

2  because of the side effects of the medication?

3      MS. BARRIE:  Precisely, because she

4  doesn't know--all she knows is, like she testified,

5  all she knows is what she had see other kids do,

6  but it needs to be geared specifically to T█████ and

7  it wasn't really explained at the meeting.

8      HEARING OFFICER WOODS:  On that basis,

9  then I will allow the answer to that question as to

10  why the mother--I mean, did someone explain the

11  side effects.  Because she did say that the

12  psychologist thought that there would be some

13  benefit.

14      MS. CHAPMAN:  I would only ask that she

15  rephrase the question to say just that, because

16  that wasn't the initial question.

17      HEARING OFFICER WOODS:  I see.

18      BY MS. BARRIE:

19  Q    Did anyone--the psychologist explain to

20  the mother the side effects of the medication or

21  any type of medication for T████, in particular?

22  A    I don't recall that.  I don't have

wtk

1  anything in my notes in front of me in reference to

2  that piece of the medication.

3      Q    Okay.

4      A    But I do know that there was a discussion

5  about the benefits of the medication.

6      Q    You said provided encounter/tracker forms,

7  was that prior to the meeting?

8      A    What was that?

9      Q    The encounter/tracker forms, were they

10  provided prior to the meeting?

11     A    No, they were provided at the meeting.

12     Q    At--

13     A    When we brought up about the Student not

14  possibly receiving all of his services, that's when

15  the encounter/tracker forms were given to Ms.

16  Presley.

17     Q    Were those encounter/tracker forms

18  reviewed at the meeting to determine what services

19  may or may not have been provided for the Student?

20     A    No, Ms. Presley said she was going to

21  review that information.  She took the

22  encounter/tracker forms and said she would go

wtk

1  through them.

2      Q    Was the encounter/tracker forms provided

3  towards the end of the meeting or right at the

4  beginning of the meeting?

5          MS. CHAPMAN:  Objection, asked and

6  answered.

7          MS. BARRIE:  No, I--

8          HEARING OFFICER WOODS:  Well, not as to

9  when they were given only at the meeting.

10         MS. CHAPMAN:  She asked if they were

11 provided at the beginning of the meeting or when

12 they were provided.  And her response was they were

13 provided at the meeting, when it was brought up

14 that she missed the services, then the

15 encounter/tracker forms were provided.

16         BY MS. BARRIE:

17     Q    Right, so was it at the beginning of the

18 meeting or at the end of the meeting?  My previous

19 question was was it done prior to the meeting, and

20 she said, not at the meeting.

21         HEARING OFFICER WOODS:  I'll allow the

22 answer, yes.

wtk

1          BY MS. BARRIE:

2      Q    Was it at the end of the meeting, or at

3    the end of the meeting?

4      A    No, I would say in the middle of the

5    meeting.

6      Q    You testified that T██████ documents will

7    be sent to the site committee with you for review?

8      A    Mm-hmm.

9      Q    Site review committee.  Right.  And you

10   indicated that once you receive a school from the

11   site committee, then you convene a meeting?

12     A    Yes.

13     Q    So, the committee meeting is to propose a

14   school that the site committee has given you?

15     A    Yes, and discuss the placement, as well.

16     Q    That the mom brings to the table?

17     A    Yes.

18     Q    How many meetings have you convened--MDT

19   meetings, not just for Tiara, but in general in

20   your capacity as a special-ed coordinator?

21     A    A whole lot of meetings.

22     Q    In your experience as a DCPS

wtk

1   special-education coordinator, what are he

2   possibilities of a parent's placement, especially a

3   private placement being provided as opposed to the

4   placement given to the special-ed coordinator from

5   the site review committee?

6          MS. CHAPMAN:  I'm objecting to that

7   question.

8          HEARING OFFICER WOODS:  Yeah, I think we

9   do have to stay focused on this child.

10         MS. BARRIE:  All right.

11         BY MS. BARRIE:

12     Q    When, then, at the meeting did you not or

13  rather agree to the placement that the mother

14  recommended a the meeting?

15     A    Because if there is a DCPS placement that

16  can meet the Student's needs, that's the placement

17  that you offer.

18     Q    Did, I assume you called the meeting,

19  correct, you sent a notice for a meeting?

20     A    Yes.

21     Q    Was the purpose of the meeting to discuss

22  her academics and placement?

wtk

1        A    Yes.

2        Q    Prior to this last meeting, were there

3    discussions from the Parent as to he

4    appropriateness of or rather of the possibility of

5    her in another placement that may be appropriate

6    for her?  Has the mother ever brought it up,

7    rather?

8        A    Another placement?

9        Q    Right, previous to this August meeting?

10       A    I note in the other meeting notes of

11   4/29/05.

12       Q    Okay.

13       A    I don't have those in front of me, I only

14   have 8/2/05 meeting notes, but I remember seeing

15   one of these schools in the placement meeting

16   notes.

17            MS. BARRIE:  That's it, thank you.

18            HEARING OFFICER WOODS:  Ms. Chapman?

19            MS. CHAPMAN:  I just have one redirect

20   question.

21                  REDIRECT EXAMINATION

22            BY MS. CHAPMAN:

wtk

1    Q    Ms. Smith, this is Rashida Chapman, again.

2    Can you tell me, when the encounter/tracker forms

3    were delivered to Ms. Presley, was the Parent in

4    the room?

5    A    Yes, she was.

6        MS. CHAPMAN:  No further questions.

7        HEARING OFFICER WOODS:  I'm sorry, thank

8    you.

9        MS. CHAPMAN:  Thank you, Ms. Smith.

10        HEARING OFFICER WOODS:  Okay, DCPS.

11        MS. BARRIE:  Can I call Accotink?

12        HEARING OFFICER WOODS:  Yes.

13        [Phone call placed.]

14        HEARING OFFICER WOODS:  Who is that?

15        MS. BARRIE:  Ann Warnke [ph].

16        HEARING OFFICER WOODS:  Ms. Warnke?

17        MS. WARNKE:  Yes.

18        HEARING OFFICER WOODS:  This is Fred Woods

19    the Hearing Officer.

20        MS. WARNKE:  Good morning.

21        HEARING OFFICER WOODS:  Good morning,

22    ma'am.  We're in the due-process hearing for T██████

112

wtk

1  T█████.  Also in the room with us is her mother, Ms.

2  Gales, and DCPS counsel, Ms. Chapman.  We're

3  prepared to receive your testimony, so you will be

4  questioned by Ms. Barrie, to be followed by Ms.

5  Chapman.

6        MS. WARNKE:  Yes, sir.

7        Whereupon,

8              ANN WARNKE

9  was called as a witness and, having been first duly

10 sworn by the Hearing Officer was examined and

11 testified as follows:

12       HEARING OFFICER WOODS:  MS. Barrie will

13 begin the questions.

14              DIRECT EXAMINATION

15       BY MS. BARRIE:

16   Q    Can you say your name for the Record,

17 please?

18   A    Sure, my name is Ann Warnke.

19   Q    Can you state your position, please?

20   A     I am the assistant educational teacher at

21 Accotink Academy.

22   Q    Are you aware of T█████ T█████?

wtk

1    A   Yes, I am.

2    Q   Has T▄▄▄ been to the school to visit?

3    A   Yes, she has.

4    Q   During her visit--have you reviewed her

5 documents?

6    A   Yes, I have.

7    Q   Perfect.  Now, in reviewing her documents

8 and her visit, do you feel you can provide her with

9 the services she's in need of?

10    A   Yes we do.

11    Q   Can you provide her with 29 1/2 hours of

12 specialized-instruction?

13    A   Yes.

14    Q   An hour and a half of psychological

15 services?

16    A   Yes.

17    Q   One hour speech-and-language therapy?

18    A   Yes.

19    Q   Can you tell us a little bit about your

20 program at Accotink, please?

21    A   We're a full-time, special-education

22 therapeutic day school.  And we provide educational

wtk

1   and support services to children through the ages

2   of 5 through 21.

3          Our classrooms have a very low

4   student-to-teacher ratio.  They focus on academic

5   skills with a language-based--in the language-based

6   classroom because the majority of our students have

7   language issues.

8          We have very specific reading programs

9   that are used on a daily basis by the classroom

10  teachers and ore overseen by the

11  speech-and-language pathologist that we have.  And

12  they also use the reading across the curriculum so

13  that reading is taken--it's worked on throughout

14  the whole day.

15         We have support services of individuals in

16  counseling by clinical psychologists and our

17  therapists.  We have occupational therapists on

18  staff.  We have three full-time occupational

19  therapists.  We also have a full-time

20  speech-and-language pathologist.  The children

21  receive physical education; we also have computers

22  in the classroom and computer instruction in our

1    computer lab.

2        Q    Are your teachers

3    certified--special-education certified?

4        A    All of our teachers have to be certified

5    in the State of Virginia, yes.

6        Q    Are you willing to accept T▓▓▓▓ into your

7    program?

8        A    Yes, we are.

9        Q    What's your student/teacher ratio in a

10   classroom for Tiara?

11       A    The classroom, we're just

12       in the process right now of setting up the

13   sessions for the fall and she would be the sixth

14   student in this classroom.   Right now it's a

15   three-to-one ratio.

16           MS. BARRIE:   No more questions, thank you.

17           HEARING OFFICER WOODS:   Ms. Chapman.

18                    CROSS-EXAMINATION

19           BY MS. CHAPMAN:

20       Q    Hi, Ms. Warnke, this is Rashida Chapman

21   from DCPS, how are you?

22       A    Good morning, fine and how are you?

wtk

1      Q    I'm fine, thank you for asking.  I've just

2  got a few questions for you on cross.  You

3  testified earlier that your teachers are certified

4  in Virginia?

5      A    In the State of Virginia, yes.

6      Q    What are this certifications in?

7      A    Well, they have to be certified in special

8  education.  And then our high school teachers or

9  any of the teachers that are awarding credits to

10  the students, they have to be not only certified in

11  special-ed, but also in the content area that

12  they're teaching.

13      Q    What are the classifications of the

14  majority of students at Accotink?

15      A    It varies.  The majority, I would say

16  would be ED, LD.

17      Q    Mm-hmm.

18      A    We also have children who have a label of

19  mild mentally retarded; we have some that are

20  speech-and-language impaired; some developmentally

21  delayed, but the majority of them would be in the

22  ED or LD area.

wtk

1    Q    Let me see, how many social workers do you

2    have on staff at Accotink.

3    A    We have no social workers, we have

4    clinical psychologists who do the therapy with the

5    children and are therapists.

6    Q    So, how will you--you're familiar with the

7    Student's most recent IEP?

8    A    I have the IEP From 12/04.

9    Q    Is that the only IEP you have?

10    A    That's the IEP you have here, yes.

11    Q    So, how are you able to know if you can

12    implement the Student's current IEP, if you don't

13    even have a copy of it?

14    A    I was under the impression this was the

15    current IEP, the last one that was signed.

16    Q    Let's see you said 12--what's the date of

17    that?

18    A    12/14/04.

19    MS. CHAPMAN:  So, all right, well, no

20    further questions for this witness.

21    HEARING OFFICER WOODS:  Ms. Barrie?   Oh,

22    I'm sorry, Ms. Warnke, Ms. Barrie might have a few

wtk

1   more questions.

2            THE WITNESS:  Sure.

3                    REDIRECT EXAMINATION

4            BY MS. BARRIE:

5        Q    Do you have services for students with

6   ADHD?

7        A    Yes, most of our children have ADHD, it's

8   not always the primary classification, but the

9   majority of them also have that.

10       Q    Now, the December IEP, well--you are a

11  full-time therapeutic program, correct?

12       A    Absolutely, yes we are.

13       Q    There's an IEP for August '05 that has 29

14  and 1/2 hours of specialized instruction, can you

15  service her with that?

16       A    Yes.

17       Q    As opposed to the--, I guess--  If the

18  goals within the new IEP and the December IEP that

19  you have not changed, did you really need to see

20  the new IEP?

21       A    If the goals are the same--

22            HEARING OFFICER WOODS:  Ms.--

119

wtk

1          MS. CHAPMAN:  Hold

2          HEARING OFFICER WOODS:  Okay the objection

3   is--go ahead she can answer.

4          BY MS. BARRIE:

5       Q    If everything within the old IEP and the

6   new IEP are the same, did you really need to see

7   the new IEP?

8       A    No, because we based her coming here based

9   upon having her come in for an interview based on

10  this IEP.

11         MS. BARRIE:  All right, no further

12  questions.

13         MS. CHAPMAN:  I have one last question in

14  redirect.

15         HEARING OFFICER WOODS:  This is Ms.

16  Chapman.

17         THE WITNESS:  Yes sir.

18                   RECROSS EXAMINATION

19         BY MS. CHAPMAN:

20      Q    Ms. Warnke, Ms. Chapman, again.  Let me

21  ask you, is it normal for you to base your

22  admissions decisions based on out-dated information

wtk

1    or old information?

2        A    Unfortunately, a lot of times when

3    students come to us for interviews, that's all that

4    they have available; information has not been

5    updated or testing that was supposed to be done was

6    not done, so we have to request that.

7            MS. CHAPMAN:  No further questions.

8            HEARING OFFICER WOODS:  Thank you.

9            THE WITNESS:  Thank you, bye, bye.

10           MS. CHAPMAN:  I'm willing to, once again,

11   to proffer as to what she would say.

12           HEARING OFFICER WOODS:  Okay.

13           MS. CHAPMAN:  Given the time.

14           HEARING OFFICER WOODS:  Okay.

15           MS. CHAPMAN:  Because I don't know.

16           HEARING OFFICER WOODS:  Well, maybe we

17   could file, you could make a statement if you want,

18   as opposed to proffer--

19           HEARING OFFICER WOODS:  Why don't we swear

20   in the witness and then you can proceed and if in

21   summary form, however you want to do it.  Ms.

22   Millis, we're ready to receive your testimony

121

wtk

1        Whereupon,

2                    SHARON MILLIS

3   was called as a witness and, having been first duly

4   sworn by the Hearing Officer was examined and

5   testified as follows:

6        HEARING OFFICER WOODS:  Ms. Barrie, you

7   may proceed.

8                    DIRECT EXAMINATION

9        BY MS. BARRIE:

10       Q    Can you say your name for the Record?

11       A    My name is Sharon Millis.

12       Q    Your position?

13       A    I am currently a special-education

14   advocate and I provide expert testimony in court

15   and due-process hearings, as well.

16       Q    Ms. Millis, have you reviewed T█████

17   T███████ documents?

18       A    Hold on.

19       MS. CHAPMAN:  I just have a clarification

20   based on what you just said, are you trying to

21   proffer her as an expert, as an expert or a

22   witness.

122

wtk

1          MS. BARRIE:  She's a witness

2          MS. CHAPMAN:  She's an expert I mean, I

3    need to know if you're trying to use her as an

4    expert?

5          MS. BARRIE:  Right and someone

6    knowledgeable in IEPs.

7          MS. CHAPMAN:  Well, I'm objecting to her

8    being an expert.  I mean, she can, obviously

9    testify, but I'm objecting to her being an expert

10   witness.  You may proceed.

11         HEARING OFFICER WOODS:  Okay.

12         MS. CHAPMAN:  There's no resume disclosed,

13   no notice that she was going to be used as an

14   expert.  In fact on her name on the witness list,

15   it just says Sharon Millis and/or designee.  And,

16   in our disclosure we reserve the right to object

17   any person as an expert where a resume has not been

18   disclosed and DCPS put on notice that that--

19         HEARING OFFICER WOODS:  You're about to

20   move into your testimony?

21         MS. BARRIE:  Yes.

22         HEARING OFFICER WOODS:  Why don't--if you

123

wtk

1  object to parts of her testimony, at this point,

2  she's not proffered as an expert, but she's going

3  right to the testimony.

4       MS. CHAPMAN:  Okay, I just, because she

5  said expert, I just wanted to make sure she's--

6       MS. BARRIE:  Her resume's on record with

7  D.C. Public Schools.

8       [Simultaneous conversation.]

9       BY MS. BARRIE:

10      Q    Number one, have you reviewed her IEPs?

11      A    Yes, I actually have, I've reviewed, I

12  believe it's five IEPs going all the way back to

13  9/26/03, so there's one, two, I believe it's five

14  IEPs, that's correct.

15      Q    The review of her IEPs, what did you find?

16      A    With the exception of the one that was

17  done at Winston, which was the '03 IEP, and even

18  that one has a lot of similarities, the ones that

19  have been done at Payne are basically identical to

20  each other for the last two years; identical goals

21  and objectives; there isn't any discussion of

22  progress and, I believe, even the present levels

124

wtk

1   are basically the same.  And I'm not exactly sure

2   where the present levels come from because the

3   evaluations that I reviewed have very different

4   scores than the ones that are indicated on the

5   present level page.

6       Q   In reviewing the IEP and reviewing her

7   evaluations, are you aware that she has--it's

8   indicated that she has--she's ADHD?

9       A   Yes, it's already been confirmed that

10  she's ADHD.

11      Q   Is there anywhere in her IEP where the

12  ADHD disabilities are addressed, as far as the

13  goals and objectives are concerned?

14      A   The only thing that they have addressed is

15  self-control in various situations.  But that's not

16  necessarily ADHD.  The degree to which her ADHD

17  impacts her--

18          MS. CHAPMAN:  I'm going to object to this

19  testimony as to there's no basis for her ability to

20  testify as to the degree of any--she's not--in

21  terms of ADHD, she's not an expert in ADHD, she's

22  not stating for the Record any expertise or

125

wtk

1  knowledge in the area of ADHD and there's been

2  nothing in the Record that says she's evaluated the

3  particular student to be able to speak to the

4  degree of any issues that she may have and how they

5  will affect.

6       HEARING OFFICER WOODS:  I think the

7  question she was responding top was there anything

8  in the Record that addressed ADHD, though, not.

9       MS. CHAPMAN:  Well, she just stated the

10 degree to which her ADHD affects--she was speaking

11 about her--she was making a statement about the

12 degree to which she believes the ADHD affects the

13 student.  Not anything, she didn't say, reference

14 any portion

15      THE WITNESS:  I'm sorry, I actually,

16 didn't get a chance to finish.

17      HEARING OFFICER WOODS:  Why don't--

18      MS. BARRIE:  It's actually--

19      THE WITNESS:  The degree to which it

20 affects her academics is echoed not only throughout

21 the meetings for the last two years, but is also in

22 every single evaluation, so this is not my opinion,

126

wtk

1   necessarily, although it certainly concurs with my

2   opinion.  But this is DCPS's documentation about

3   the ADHD, which affects everything for this child.

4   And I can reference exactly where in the meeting

5   notes if you want me to do that.  I have no problem

6   with that.

7           MS. CHAPMAN:  Please do.

8           THE WITNESS:  Okay.

9           MS. CHAPMAN:  And, if the testimony's just

10  going to be strictly based on stuff in the Record,

11  then I would just move at this time that they just

12  point us to what specifically in the Record, I

13  mean, that's the extent of the testimony already.

14          THE WITNESS:  If we're going to look at

15  the 4/29 IEP, on Page 3 of 5 of the meeting notes.

16          MS. BARRIE:  Hold on, hold on.

17          HEARING OFFICER WOODS:  Hold on one

18  second.

19          THE WITNESS:  Actually, the most recent

20  IEP meeting 4/29/05 TT-11, Page 3 of 5, talks about

21  the school psychologist and the whole entire page

22  discusses her current problems.  Where it says her

127

wtk

1  diagnosis of ADHD is impairing her ability to

2  attend to academic tasks; concentrate and maintain

3  information; intervention, such as medication;

4  mediation; Tai Chi; Yoga all sorts of things should

5  be considered so that symptoms of ADHD can be more

6  effectively addressed.

7          In addition to that and I mean that's--I

8  can point you to the other IEPs that also have

9  similar information which talks about the intensity

10  and degree of he ADHD and the impact that's it

11  having.

12          But in addition to that, her behavior plan

13  has not changed since she's been at Payne, okay?

14  And if she's still having difficulties--I mean, I

15  have a 10/1/04 behavior plan; a 5/19/04 behavior

16  plan; and I have a 4/29/ behavior plan and they're

17  all identical.  So, if her behavior has continued

18  to be problematic and the behavior plan has not

19  addressed it, then there's something that's going

20  on here and something should be changed.  It should

21  have been reviewed.  There should have been a

22  functional behavioral assessment to determine

wtk

1    whether or not this behavior plan was appropriate.

2    If behavior is the whole thing and she needs a

3    therapeutic setting, as the school system says,

4    then you need to be able to address what the

5    function of her behavior is doing regarding her

6    academics.  So, there's a tremendous concern with

7    that.

8            And, then, of course, the disability's not

9    listed on as a disability classification.

10           BY MS. BARRIE:

11       Q    What disability?

12       A    Other health impaired.  And it appears

13   from what DCPS has said and from the evaluations

14   that her ADHD rises to the level of other health

15   impairment.  That's another reason for the

16   psychiatric, because no one has been willing, even

17   though they've said the ADHD is there, it's

18   pervasive, it's really interfering with what's

19   going on.  No one has been wiling to say, we're

20   going to make her other health impaired, as well.

21           So, having not sent this information to

22   Dr. Taylor-Davis to make a determination and saying

) wtk

1    that she needs all sorts of other interventions,

2    including medication, you need to have a

3    psychiatric, as well.  I mean, that's one of the

4    reasons that you have it; not only for the

5    medication, but to make a determination about the

6    disability classification, which would, in turn,

7    impact on the goals and objectives; and that would

8    impact on the programming in the placement.

9        Q    In--well, I guess I can probably just

10   proffer that from the notes.  But, in reading the

11   information and reading the notes and the

12   evaluations, does it appear that there has been

13   much progress by T██████?

14       A    No--

15          MS. CHAPMAN:  I'm going to object to--I

16   mean, that's already in the notes.  This witness

17   right here is not--there's no record of her

18   teaching and/or evaluating the Student to be able

19   to make that type of judgment

20          HEARING OFFICER WOODS:  All right, so it's

21   based on just her review of the documents?

22          MS. BARRIE:  Correct.

130

wtk

1      THE WITNESS:  Right.

2      HEARING OFFICER WOODS:  Maybe that, if she

3  said, based on her review of the documents, had

4  there been any progress?  Would that be fair.

5      MS. CHAPMAN:  She did say from looking at

6  the notes and I was still objecting because--

7      HEARING OFFICER WOODS:  Oh, I see.

8      MS. CHAPMAN:  --yeah.

9      HEARING OFFICER WOODS:  It seems like

10  that's a fair question, if that's the basis of her

11  testimony, she started with I have reviewed X, Y,

12  and Z and based on it, she's now proffering her--so

13  I think that's--I'll overrule that objection that

14  seems a question consistent with the basis for the

15  testimony.

16      THE WITNESS:  Goals and objectives are the

17  meat of what's going on with a child.  I mean, that

18  should indicate progress.  And if nothing has

19  changed in the last two years, now, I mean,

20  literally, these goals and objectives were just

21  Xeroxed and put in in a cover sheets, which

22  indicates that there hasn't been any kind of

131

wtk

1  change.  If there has, it certainly has not been

2  addressed by the team.  Because you just can't keep

3  putting goals and objectives in and having a child

4  not make progress and expect something to change.

5       In addition to the fact that the behavior

6  plan hasn't changed.  And there's actually even a

7  concern in the review of the evaluations, as to

8  whether they have the right cognitive level for

9  this child.  Because some of her scores indicate

10  that she's low average and some indicate that she's

11  even lower than that, borderline.  So, I'm not even

12  sure if the goals and objectives that they had for

13  her are appropriate, which may indicate why she

14  hasn't made any progress.

15       MS. BARRIE:  Thank you.

16       HEARING OFFICER WOODS:  Ms. Chapman?

17            CROSS-EXAMINATION

18  BY MS. CHAPMAN:

19    Q    Ms. Millis, let me ask you, have you

20  conducted any evaluations on this Student?

21    A    Not on this Student, no, but I'm very

22  familiar with the evaluations that have been

wtk

1  conducted on this Student and have done academic

2  and educational evaluations quite often in my line

3  of work.

4      Q    But none on this Student?

5      A    No, none on this Student.

6      Q    Have you ever taught this Student?

7      A    No, I have not.

8      Q    Have you ever provided any related

9  services to this Student?

10     A    No.

11     Q    Have you ever attended any IEP meetings,

12 placement meetings, MDT meetings on behalf of this

13 Student?

14     A    I have not attended any IEP meetings, I

15 don't believe there have been any placement

16 meetings.

17     Q    Have you ever observed the Student in the

18 classroom?

19     A    No, I haven't.

20     Q    Have you ever met the Student at all?

21     A    No.

22     Q    So--have you consulted with the evaluators

wtk

1   that performed the evaluations on this Student?

2       A    I actually did speak with Dr. Gray ph--

3       Q    Which evaluation did he do?

4       A    He did a review of the clinical that he

5   really was not particularly familiar and his review

6   was a while back.   And I asked him, because I was

7   very concerned about the discrepancy in the

8   cognitive levels.   And he honestly could not

9   remember, so I did attempt to consult, yes I did.

10          MS. CHAPMAN:  Actually, I think that's it,

11  no further questions.

12          HEARING OFFICER WOODS:  Thank you, Ms.

13  Millis.  Anything further, Ms. Barrie?

14          MS. BARRIE:  How about opening, I'll try

15  to go fast.

16          MS. CHAPMAN:  Opening?

17          MS. BARRIE:  I mean closing.

18          MS. CHAPMAN:  You know what can I make a

19  request that we submit the closings to you in

20  writing?

21          HEARING OFFICER WOODS:  Fine with me if

22  you want.

wtk

1          MS. BARRIE:  Yes.

2          MS. CHAPMAN:  Okay.

3          HEARING OFFICER WOODS:  When do you want

4   to do that so that I can keep my--

5          MS. CHAPMAN:  What's today?  Well, that's

6   tomorrow.

7          HEARING OFFICER WOODS:  Monday, Tuesday?

8          MS. CHAPMAN:  Tuesday.

9          HEARING OFFICER WOODS:  To give you all

10  time, you don't have to--

11         MS. CHAPMAN:  Okay.

12         HEARING OFFICER WOODS:  Oh, no, you I

13  don't like putting people under time constraints.

14  What works--you all have different schedules.  What

15  works for you--it won't hold up the order now?

16         MS. BARRIE:  Right, actually, that's my

17  concern.

18         HEARING OFFICER WOODS:  When do you want

19  it?

20         MS. CHAPMAN:  I would prefer Tuesday

21  c.o.b.

22         HEARING OFFICER WOODS:  What's oh, close

wtk                                                      135

1   of business.

2          MS. CHAPMAN:  Yeah, sorry.

3          MS. BARRIE:  I'll work on Monday

4   [unintell.]

5          HEARING OFFICER WOODS:  I'll still keep

6   within the 10-day.

7          MS. CHAPMAN:  Well if he was to ask--

8          HEARING OFFICER WOODS:  No, I'm not going

9   to, yeah, I'm not going to add this to--

10         MS. CHAPMAN:  So, if he's saying that

11  he'll still keep it within the 10-days would you

12  agree to Tuesday?

13         MS. BARRIE:  Yes.

14         MS. CHAPMAN:  Okay.

15         HEARING OFFICER WOODS:  No, yeah, I wasn't

16  going to add this to the--

17         MS. BARRIE:  Okay, all right.

18         HEARING OFFICER WOODS:  So, Tuesday,

19  because if it's not there--

20         MS. CHAPMAN:  Then there's no closing.

21  okay.

22         HEARING OFFICER WOODS:  Okay, and just

136

wtk

1    give it to the Student Hearing Office and I'll look

2    for it there.

3            MS. BARRIE:   Thank you.

4            MS. CHAPMAN:   Thank you.

5            [Whereupon, the hearing was concluded.]

6                       -  -  -

# CERTIFICATE

I, hereby, certify that the tape recording represented by the foregoing pages was transcribed by me; and that the foregoing transcript is a correct and accurate record of the proceedings to the best of my knowledge, ability and belief.

*William T. Kennedy*

**WILLIAM T. KENNEDY**

**TRANSCRIBER**